IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

LARRY CLINE

       Plaintiff,

v.                                                                                CIV. No. 99-149 JP/RLP

ROBERT J. PERRY, Cabinet Secretary,
Department of Corrections of the State of
New Mexico, in his individual and official
capacities, DONA WILPOT, Deputy
Secretary, JOHN M. ROBERTSON, Health
Services Bureau Chief and Medical Director,
KATHLEEN NESTOR, Mental Health
Director for the Department of Corrections,
and JULIUS SIEGEL, Director of Mental
Health at the Southern New Correctional
Facility, in their individual capacities,

       Defendants.

**MEMORANDUM OPINION AND ORDER**

On or about January 18, 2000 Defendants served a Motion for Summary Judgment to which Plaintiff served a response on or about February 1, 2000. That motion will be denied with respect to Count One, and granted with respect to Counts Two and Three.

I.     Background

The allegations in the complaint are as follows: Plaintiff worked for Defendants as a clinical social worker at the Southern New Mexico Regional Correctional Facility, starting September 9, 1996. Soon after he started work, he contacted Bill Stanton, the Assistant Special Master in the Duran consent decree case about Plaintiff's concern over possible violations of that decree. He would voice his concerns to Mr. Stanton and the Master several times over the course

of his employment, which ended upon his firing in December 1998. Beginning December 1996 and through the duration of his employment, Plaintiff also met or spoke with Peter Cubra, Esq. and other attorneys for the Duran plaintiffs on about fifty occasions. His main concerns were violations of the portions of the Duran decree on inmate mental health.

In late July 1998, Defendant Perry issued an internal memo advising all Department of Corrections mental health staff that he intended to promptly initiate "aggressive personnel action" against "'those few individuals that are not contributing [to] and/or worse yet, frustrating our corrective action plans.'" (Complaint ¶ 24.) A few days later, Defendant Wilpot accused Plaintiff of not being a "team player" because Plaintiff refused to falsify inmate mental health records so that the Department. of Corrections would come into compliance with the Duran decree. Defendant Wilpot told Plaintiff that she had instructed Steve Nance, Duran Compliance Monitor for Dept. of Corrections mental health, to discipline Plaintiff if Plaintiff did not change the contents of certain inmate mental health files.

On August 5, 1998 Plaintiff received a letter of reprimand from Defendant Siegel for failure to perform his duties on July 20-21, 1998.[1] On August 11, 1998 Plaintiff filed a grievance for the reprimand, which on August 17, 1998 Defendant Siegel denied. On August 21, 1998 Plaintiff appealed to Dr. Don Davidson, Deputy Director of Health Services for the Department of Corrections. On September 28, 1998, Dr. Davidson decided to remove the letter of reprimand from Plaintiff's file and instructed Defendant Siegel to place Plaintiff on a work improvement plan. On November 8, 1998 Defendant Siegel did so following accusations on October 28, 1998

---

[1] Although the implication is that the "duties" were the maintenance of mental health records, the complaint is not explicit.

by Defendant Siegel to Plaintiff that Plaintiff failed to complete Duran paperwork. On November 10, 1998 Defendant Siegel reassigned Plaintiff to the "Therapeutic Community." (Id. ¶ 32.)

On November 30, 1998 Defendant Robertson issued to Plaintiff a Notice of Contemplated Action indicating that he sought Plaintiff's dismissal for the reasons noted in the letter of reprimand issued earlier: failure to perform his duties on July 20-21, 1998.[2] On December 4, 1998 Defendant Siegel placed Plaintiff on administrative leave per Defendant Robertson's authorization. On December 11, 1998 Plaintiff and his attorney presented oral and written responses to the employment actions Defendants had taken against Plaintiff. On December 14, 1998 Plaintiff provided one of the Duran attorneys with a sworn statement concerning Plaintiff's perceived violations of the Duran decree. December 22, 1998 Defendant Robertson issued a Notice of Final Action terminating Plaintiff's employment.

Plaintiff did not pursue any remedies under the New Mexico Personnel Act. See N.M. Stat. Ann. § 10-9-1 et seq. (1995 Repl. Pamp.).

On February 12, 1999, Plaintiff filed his complaint in which he alleges three causes of action. First, Plaintiff sues under section 1983 for violations of his rights to speak and associate freely under the First Amendment. Second, he brings an action under 42 U.S.C. 1983 for alleged violations of his rights to procedural due process under the Fourteenth Amendment. Last, he brings a claim under 42 U.S.C. 1985(2) for an alleged conspiracy to prevent him from testifying.

On January 18, 2000 a pretrial conference was held at which Plaintiff's counsel confirmed that Plaintiff asserted only the three claims described above. At the pretrial conference, the

---

[2] The Notice of Contemplated Action describes Plaintiff's alleged failure to act professionally on unspecified dates.

parties also discussed the Motion for Summary Judgment. I indicated that the Plaintiff need not respond to several of the arguments made in the motion, for various reasons stated on the record and in an Order filed on January 18, 2000 following the pretrial conference. I now address the three that remain.

II.   Standard

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). When applying this standard, the factual record and reasonable inferences therefrom are examined in the light most favorable to the party opposing summary judgment. See Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). The party moving for summary judgment bears the burden of "'showing'--that is, pointing out to the district court-- that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U. S. 317, 325 (1986). Only then does the burden shift to the non-movant to come forward with evidence showing that there is a genuine issue of material fact. See Bacchus Indus. Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991). The non-moving party may not avoid summary judgment by resting upon the mere allegations or denials of the pleadings. See id.

III.   Count One

Defendants argue that they are entitled to qualified immunity. But in support of their first argument, Defendants appear to misunderstand the claim in Count One. Count One alleges that Defendants trammeled Plaintiff's First Amendment rights to freedom of speech and association, actionable under 42 U.S.C. § 1983. Count One is not a Title VII retaliation claim. The legal standard which Defendants cite and apply in their supporting brief is derived not from the rather

4

vast body of law concerning First Amendment retaliation claims brought under section 1983, but from Title VII. The law defendants cite and the application they make therefore does not apply to this case. (See Mem. Br. in Supp. of Defs' Mot. for Summ. J. at 5-7.)

Defendants are correct, however, in noting the general two-step standard for qualified immunity. When a defendant raises qualified immunity, the plaintiff bears the burden of producing evidence that the defendant violated the law and that such law was clearly established when the violation occurred. See Clanton v. Cooper, 129 F.3d 1147, 1153 (10th Cir. 1997). Defendants' arguments that Plaintiff fails to meet both steps of the qualified immunity analysis is incorrect, however.

  A. Allegation of First Amendment violations

Plaintiff alleges two constitutional violations for which Defendants claim qualified immunity: violations of the First Amendment rights to freedom of speech and association. Each of these has distinct elements (none of which Defendants correctly address) which in this case fold into one. In Schalk v. Gallemore, 906 F.2d 491, 497-98, the Tenth Circuit noted the Supreme Court's dichotomy of freedom of association claims. One class includes the protection afforded by the Constitution to enter into "certain intimate human relationships." The other protects the right to associate for the purpose of engaging in other activities which the First Amendment protects, including the right to speak freely, assemble, and petition for the redress of grievances. While Plaintiff does not address the category into which he fits, it appears he fits into neither. "The 'association' that [Plaintiff] seeks is nothing more nor less than an audience for [his] speech. It therefore must collapse into the . . . discussion regarding [his] right to free speech." Id. at 498.

In determining whether Plaintiff has alleged a free speech violation, the first step in a

5

qualified immunity analysis, a court should apply the Pickering/Connick test.

> First, the court must determine whether the employee's speech can be fairly characterized as constituting speech on a matter of public concern. If so, the court must then proceed to the second step and balance the employee's interest, as a citizen, in commenting upon matters of public concern against the interest of the State, as an employer, in promoting the efficiency of the public service it performs through its employees. Assuming that the Pickering balancing test tips in favor of the employee, the employee, under the third step, must prove that the protected speech was a substantial factor or a motivating factor in the detrimental employment decision. Finally, if the employee makes this showing, the burden then shifts to the employer to show "by a preponderance of evidence that it would have reached the same decision . . . even in the absence of the protected conduct. Steps one and two concern whether the expression at issue is subject to the protection of the First Amendment. Thus, they present legal questions to be resolved by the court. In contrast, the third and fourth steps concern causation and involve questions of fact to be resolved by the jury.

Gardetto v. Mason, 100 F.3d 803, 811 (10th Cir. 1996) (citations and quotations omitted).

"Speech that pertains to a public agency's 'discharging its governmental responsibilities' ordinarily will be regarded as speech on a matter of public concern." David v. City and County of Denver, 101 F.3d 1344, 1355 (10th Cir. 1996) (quoting Connick). Plaintiff alleges that he spoke out to, and associated with, those involved in enforcing the Duran consent decree and to others who represented the plaintiffs in the Duran case about what he perceived to be violations of the Duran decree, and that he spoke out to Defendants concerning what he perceived to be their unethical behavior in complying with that decree. He also claims to have spoken out on the provision of services to inmates generally and the impact of certain supervisory directives on mental health ethical standards. This speech falls into the David category. It specifically concerns the New Mexico Department of Corrections' duties under the Duran institutional reform case to remedy prison system shortcomings and generally concerns the efficacy of the New Mexico prison system--matters of public concern.

6

The next step also weighs in Plaintiff's favor.

Under the Pickering balancing test, the employee's First Amendment free speech rights are protected unless the employer shows that some restriction is necessary to prevent the disruption of official functions or to insure effective performance by the employee. Relevant considerations include whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.

Gardetto, 100 F.3d at 815 (citations and quotations omitted). As noted, Defendants failed to identify the correct legal standard and have therefore presented no evidence that preventing Plaintiff from voicing his concerns over Duran compliance and inmate mental health with those charged with monitoring such things is necessary to prevent the disruption of the Department of Corrections. Indeed they cannot, for two reasons. First, one of the Department functions is implementing the Duran decree about which Plaintiff spoke so it could hardly be said that Plaintiff's communications to further compliance would disrupt that compliance. Second, Defendants would run afoul of the general rule against raising new arguments in a reply brief. See Headrick v. Rockwell Int'l Corp., 24 F.3d 1272, 1277 (10th Cir. 1994) (noting that to hold otherwise would be unfair to the opposing party and burdensome to the court). Defendants failed to apply the correct legal standard in the motion they initiated and will consequently not be allowed another bite at the apple while Plaintiff and I wait.

As to step three, Plaintiff first claims that his termination was not the only "detrimental employment decision." He urges that harassment by Defendants Wilpot and Siegel, Defendant Siegel's letter of reprimand, Plaintiff's transfer to the Therapeutic Community, as well as the discharge are all actionable under the third step of the Pickering/Connick analysis. Plaintiff is correct that detrimental employment decisions are broadly defined with respect to First

7

Amendment retaliation claims.  See McCabe v. Sharrett, 12 F.3d 1558, 1563 (11th Cir. 1994). Defendants, again, failed to address this question in their motion.

Certainly reprimands and discharges are detrimental action.  The "harassment" which Plaintiff claims from Defendant Siegel appears to be part of the same conduct that led to the reprimand and discharge and so should similarly be considered detrimental.  The harassment by Defendant Wilpot, in the form of threatened reprimand is also a detrimental employment action. Plaintiff does not elaborate on the transfer to the Therapeutic Community, but its occurrence immediately after a reprimand, placement on a Work Improvement Program and a recommendation for further disciplinary action suggests that the transfer too was a detrimental employment action.

Still within the third Pickering/Connick step then, the examination turns to whether the protected activity was "a substantial factor or a motivating factor in the detrimental employment decision."  Gardetto, 100 F.3d at 811.  Plaintiff relies on the temporal proximity between his protected speech and the adverse employment actions to prove this causal element.  See Prince v. Clausen, No. 96-S-2384, 1999 WL 152282, at **3 (10th Cir. Mar. 22, 1999).

A jury could indeed infer that Plaintiff's speech motivated Defendants to take detrimental employment decisions.  As just one example in Plaintiff's testimony, Plaintiff voiced his reservations about amending records to come into Duran compliance days after Defendant Perry issued a memo allegedly calling for all employees to insure a "substantial compliance" Duran finding.  Soon after, Plaintiff was reprimanded.

Other evidence also suggests confirmation of the inference.  (See Pl's Resp. at Ex. B (affidavit of Robert Cathey, Clinical Director at Plaintiff's former place of work, testifying that

Defendant Siegel knew about Plaintiff's Duran speech and that all mental health staff completed paperwork in a fashion similar to Plaintiff but only Plaintiff was fired) and Ex. C (affidavit of Peter Cubra, Esq., testifying that Department of Corrections policy was to conceal facts from those monitoring Duran compliance). The clear implication is that Plaintiff suffered detrimental employment decisions for engaging in protected conduct.

Defendants present evidence of their own, at the fourth Pickering/Connick step (although without identifying it as such), challenging Plaintiff's causal argument at step three and suggesting that Defendants would have fired Plaintiff even in the absence of the protected conduct. The most significant evidence is in the Notice of Contemplated Action, in which reference is made to supporting evidence, that Plaintiff failed to carry out certain of his work duties and himself violated the Duran decree. Defendants' argument is that Plaintiff did things such as back-date file charts and notes, sometimes reflecting dates on which Plaintiff did not actually work. Plaintiff responds that it is his normal practice to schedule a "paperwork day," usually a Friday or weekends, in which he completes notes from client/inmate sessions held during the course of the week. Session notes bearing dates when Plaintiff was not working reflect his "clerical mistakes" resulting from, for example, his Friday transcription of a session held on Tuesday with a client he normally would see on Monday but did not because he had taken that particular Monday off.

Also bearing on whether protected conduct was a substantial factor or a motivating factor is Plaintiff's testimony that "they" singled him out for discharge even before Plaintiff spoke to anyone about Duran.[3] Defendants have shown some evidence to rebut Plaintiff's, but certainly have not shown by a preponderance of the evidence that they would have terminated Plaintiff

---

[3] Plaintiff testified also that he did not know who "they" were.

without the protected conduct and thus, under Gardetto, the question is for a jury to decide.

    B.  Clearly established law

  Before going to a jury, however, Plaintiff must show that the alleged violations were contrary to clearly established law. Defendants argue that they are entitled to qualified immunity because, essentially, Plaintiff was fired for cause which does not violate any law. Defendants miss the point which Schalk illustrates well.

  In Schalk, the plaintiff worked at a hospital as a part-time patient accounts clerk under the supervision of the defendant, who was later appointed chief administrator of the hospital. Sometime before the defendant's appointment, the plaintiff wrote a letter to the hospital board of directors asking to be heard on a number of issues. She expressed her concerns over certain employees in other departments not working their full shifts and a perceived waste of hospital resources. She also included in her letter a section entitled "personal complaints" which included her views on a dispute she had with another supervisor and the plaintiff's failure to receive a raise. The board sent her a letter in response, addressing each question or issue. Soon after, at a counseling session, the defendant and the plaintiff's immediate supervisor informed the plaintiff that "complaints of this nature" would not be tolerated in the future. Following the counseling session, the plaintiff encountered a hospital board member at the supermarket. The plaintiff expressed to the board member her perception of hospital waste and inefficiency, including her concerns about nurses sleeping on the job. When the defendant found out, he fired the plaintiff. See Schalk, 906 F.2d at 492-93.

  With respect to the plaintiff's claim of First Amendment retaliation under section 1983, the Tenth Circuit found that the plaintiff's communications were of a public concern and therefore

survived Pickering/Connick scrutiny. See id. at 494-98. But, the court found for the defendant on the qualified immunity question. The court found the law not sufficiently clearly established to allow the suit to proceed.

> [T]he law was clear that a public employee had a constitutionally protected right to bring waste, mismanagement, or other matters of public concern to the attention of the responsible administrative entity. Nevertheless, qualified immunity analysis requires that the court consider the operation of the rule in the context of the circumstances with which the the official was confronted. Consequently, we must ascertain whether the protected nature of [the plaintiff's] speech was sufficiently clear that [the defendant] should have been on notice that his asserted interest in preventing disruption would not survive a balancing inquiry. Specifically, we must determine whether it would have been clear to a reasonable official that [the plaintiff's] letter was addressed to matters of public concern, rather than an unprotected statement of personal grievances.
>
> Although we conclude . . . that the letter is properly viewed as directed to matters that are of public concern, we acknowledge that the issue is not clear-cut. Although the question is a close one, we cannot say that a reasonable official should have known that [the plaintiff's] allegations raised matters of public concern as a matter of clearly established law. We therefore conclude that [the defendant] is entitled to qualified immunity in a claim for damages against him individually.

Id. at 499 (internal quotations and citations omitted).

In contrast with the communications of the plaintiff in Schalk, those of Plaintiff in this case did not have the appearance of personal grievances, in spite of their true public nature. The close question that ultimately afforded immunity to the defendant in Schalk is therefore not close at all in this case. A public employee like Plaintiff has a clearly established constitutionally protected right to bring mismanagement or other matters of public concern to the attention of the responsible entities. Defendants are accordingly not entitled to qualified immunity on Count One.

IV.     Count Two

Count Two alleges that Defendants violated Plaintiff's rights to procedural due process when Defendants terminated Plaintiff for the same reasons for which Defendants had previously

disciplined him. Defendants argue that Bush v. Lucas, 462 U.S. 367 (1983) and its progeny dictate dismissal of Plaintiff's procedural due process claim.[4] Defendants' position is that the New Mexico Personnel Act is akin to the comprehensive federal statutory scheme which in Bush dictated dismissal of the plaintiff's claim for constitutional violations. See id. at 385-85. Applying Bush, Defendant contends that Plaintiff should pursue his state remedy first.

Plaintiff recognizes that Defendants provided him with a pre-deprivation hearing and he had a remedy before the State Personnel Board, but deliberately chose not to exercise it. He changes his tune in response by arguing that the tribunals to which he had recourse did not have jurisdiction over the constitutional and conspiracy claims in this case so therefore, apparently, he chose not to pursue any such options. Plaintiff also claims that the administrative remedies available to him could only cure his discharge through reinstatement and back pay so therefore, apparently, he could not be made whole. In response Plaintiff does not pursue the position in his complaint that he was somehow deprived of procedural due process for being subject to discipline twice for the same alleged misconduct.[5]

Defendants are correct that Plaintiff cannot maintain his section 1983 procedural due process claim, but for a different reason. Bush does stand for the proposition that the presence of a comprehensive statutory scheme may preclude a damages action for constitutional violations. Bush, however, was a Bivens action. Bivens actions are for those claiming constitutional violations by federal actors, for which damage remedies must be implied. In contrast, section

---

[4] Defendants' section heading purports to apply this argument to Count Three as well. Count Three, however, is a claim under 42 § U.S.C. 1985(2), to which unique exhaustion of administrative remedy provisions apply, none of which Defendants discuss.

[5] Plaintiff has never asserted a substantive due process claim.

12

1983 cases are for those suffering constitutional injury by state actors and, of course, arise by statute. Moreover, the claimed constitutional violation in Bush was for First Amendment violations, distinctly different from the claim in this case of a deprivation of procedural due process. Bush, therefore, does not control the outcome, where Plaintiff claims a procedural due process violation through Defendants acting under color of state law.

One of the principles that emerged from the seminal section 1983 case, Monroe v. Pape, 365 U.S. 167, 183 (1961) is that, "[t]he federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked." Since Monroe, the Court has carved limited exceptions to this broad rule. For example, in Parratt v. Taylor, 451 U.S. 527, 541 (1981) the Court indicated that where a plaintiff makes a section 1983 claim for an alleged deprivation of procedural due process rights from random and unauthorized state acts, the state's provision of an adequate post-deprivation remedy will defeat the federal claim. The Court in Zinermon v. Burch, 494 U.S. 113, 125 (1990) elaborated on Parratt by dividing the universe of section 1983 claims into three. One of those classes was procedural due process claims, for which "the existence of state remedies *is* relevant in a special sense. Id. (emphasis in original). The Court continued:

> In procedural due process claims, the deprivation by state action of a constitutionally protected interest in "life, liberty, or property" is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law . . . The constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process. Therefore, to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate. This inquiry would examine the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by statute or tort law.

Id. at 125-26 (citations and footnotes omitted).

Plaintiff acknowledges that Defendants provided him with a pre-deprivation hearing and that he has, or had, a remedy with the New Mexico Personnel Board which he chose not to pursue. (See Complaint ¶ 36 and Mem. Br. in Supp. of Defs' Mot. for Summ. J., Ex. B at 220.) Plaintiff therefore understandably makes no claim that Defendants, acting under color of state law, failed to provide any procedural due process. Plaintiff similarly makes no claim that Defendants or some other state body failed or would fail to provide adequate procedural due process.[6] Plaintiff claims instead that Defendants terminated him for the same reason for which they previously disciplined him, without comment on the process itself. The flaw in Plaintiff's section 1983 attempted procedural due process claim then is not so much a failure to exhaust administrative or state remedies, but rather a failure to show an absence of an administrative forum in which he could be heard. That the spectrum of administrative remedies would be less complete than in the district court is irrelevant to his claim of a procedural due process violation where he failed to show he was deprived of procedural due process and is therefore, of course, not entitled to any remedy at all as to a claimed loss of procedural due process. Thus Count Two fails but for a related yet different reason than that advanced by Defendants.

V.  Count Three

Plaintiff alleges in his complaint that Defendants conspired to deter Plaintiff from testifying "freely, fully and truthfully" in the Duran case, conduct which, if proven may be actionable under

---

[6] To the extent Plaintiff now claims the available administrative procedure was inadequate, he cites to no authority for the proposition that an administrative tribunal is deficient simply because it has limited jurisdiction. Moreover, the disposition of the present motion as to Count One presumably moots his concern.

42 U.S.C. § 1985(2). Defendants move for summary judgment as to Count Three, but without directing attention to any section 1985(2) case law. The essence of their argument is that Plaintiff's allegations of conspiracy in the complaint were wholly conclusory and could not support the charge. I agreed and at the pretrial conference directed the Plaintiff to cite candidly to evidence of a conspiracy. Plaintiff responded with evidence that might suggest Defendants Wilpot, Siegel, and Robertson knew of Plaintiff's actions. Plaintiff also clarified that he claimed that Defendants conspired to keep him from providing information to the Duran Special Master in an upcoming audit.

> Section 1985(2) states that
>
> If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror;  or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws; [then the injured party has an action for damages against the conspirators].

The Court has interpreted section 1985(2) to include two distinct parts, divided by the first semicolon. See Kush v. Rutledge, 460 U.S. 719, 721 (1983). The first relates to witness intimidation in federal court proceedings and the second applies to the same in state courts. See id. n.1. Because Duran was a federal case, only the first part of section 1985(2) could possibly apply.

Close attention to the language of that first part suggests that it applies only to the

15

testimony or attendance of witnesses or jurors. In this case, however, there is no allegation that Plaintiff was under subpoena or otherwise compelled to communicate with the Special Master.[7] But the Court in Rutledge tacitly approved a section 1985(2) claim for potential federal court witnesses (expressly deciding only another unrelated and narrow issue). Even assuming then that potential witnesses may pursue a section 1985(2) claim, however, Plaintiff falls short. The plaintiff in Rutledge sued certain school officials for various claims concerning the plaintiff's loss of a scholarship, together with a claim that they prevented him from testifying about his claims. The plaintiff in that case, in contrast with this, was certain to be a witness--the suit, after all was his own. The Duran case, an institutional class-action reform case spanning more than two decades, was much different. Suffice it to say that Plaintiff's role as a witness, if he had one at all, was minimal and strictly voluntary. While Defendants may have feared what Plaintiff might say to the Special Master, there is no reason to believe that the Special Master would contact Plaintiff. And even if the Special Master did contact Plaintiff during his audit, it is questionable whether such contact could be termed testimony within the meaning of the first portion of section 1985(2).

Alternatively, I find that Plaintiff has not presented sufficient evidence of a conspiracy to keep Plaintiff from testifying to the Special Master in violation of section 1985(2). Plaintiff points to three specific instances. First, Plaintiff claims that Defendant Robertson issued the Notice of Contemplated action following a meeting between the two at which Plaintiff refused to violate the social worker code of ethics (no indication how). This instance involves only one person and thus could hardly be found conspiratorial.

---

[7] Although not a part of his section 1985(2) claim, there is no evidence he was under a similar obligation to communicate with the Duran attorneys either.

Second, Plaintiff claims that Beth Savage, one of "Defendant Wilpolt's[8] agents . . . reported to her that she needed to talk to Dr. Siegel about Plaintiff" prior to Plaintiff's discipline and termination. (Pl's Resp. at 18-19.) Plaintiff further claims that Dr. Davidson and Steve Nance (not named defendants) had heard rumors that Plaintiff was talking to the Duran attorneys and the Special Master. Plaintiff also presents evidence that Dr. Siegel knew of Plaintiff's contacts. These allegations either fail to make a link between the conspiratorial communications and the arrival of the Special Master and/or they involve communications between individuals not named as conspirators.

Third, Plaintiff draws attention to a memo Defendant Siegel wrote to Dr. Davidson recommending that Plaintiff be transferred, Plaintiff claims, to keep him away from the Duran attorneys, increase the likelihood of Duran compliance and "reduce the possibility of disciplinary action against Plaintiff." (Id. at 19). This allegation fails for several reasons, most notably that it does not refer to the Special Master, before whom Defendants allegedly conspired to keep Plaintiff from testifying. The only reference to Duran in the memo is a remark that "through [Dr. Cathey's] efforts, I believe we will achieve and maintain Duran compliance. . . ." (Id. Ex. E.)

While there is considerable evidence that Defendants preferred that Department of Corrections employees not to speak with those prosecuting the Duran case or those monitoring Duran compliance and that Defendant Perry placed considerable emphasis on terminating Duran case judicial oversight, there is not sufficient evidence of a conspiracy under section 1985(2) to prevent Plaintiff's testimony to the Special Master in an upcoming audit.

---

[8] Plaintiff alternately uses "Wilpot" and "Wilpolt." I have chosen to use the spelling in the caption of the complaint, "Wilpot."

17

IT IS THEREFORE ORDERED THAT Defendant's Motion for Summary Judgment is denied with respect to Count One and granted with respect to counts Two and Three.

_____
**UNITED STATES DISTRICT JUDGE**